You've reserved two minutes of rebuttal time, correct? And in the event there is any unused time in my argument in chief, I would ask that that be allocated to rebuttals. In other words, if you step down earlier, we'll just add that to your rebuttal. No, Mr. Mannington, there are fancy causes in working in the government. That's correct. I've tried that. I've gotten myself a watch here. We apologize for our lack of technical expertise. You can start whenever you're ready. Thank you. Good morning, Your Honors. The government conceded in open court that it breached the contract between itself and Die Casters International, DCI. In so doing, it admitted liability under count one of the complaint. More importantly, however, the government, in its opening statement at page 25 of the transfer, also conceded that minimum amounts of damages must flow from this breach. To quote the government at page 25, line 17, What is the measure of DCI's damages resulting from the breach? The maximum amount— Is this in the appendix? Unfortunately, due to a copying error, it is not there. What is the measure of DCI's damage resulting from the breach? The maximum amount is 26 percent of the invoice amounts, which equals approximately $2.3 million, plus the intellectual property amount, which is approximately $114,000. Was there a brief comment on these concessions? On the first concession, absolutely it did. On the breach? On the breach. Not on the issue of the concession of damages. It continues to say— Well, isn't that a little late? I mean, it sort of hijacked the government. It's supposed to figure out a response to this on the spot. Well, in fairness, Your Honor, this is an unsolicited statement from the government in its opening statement. If they conceded $1 or not, why not another $1 to compensate the breach? We were—the court did not go to that point, and the court went to the issue of whether or not there was any damage whatsoever. The court came to the conclusion that there was no such damage because the court decided that DCI had no incurred costs under this contract. Well, isn't this—isn't this—and again, we haven't seen it, obviously, but isn't this alleged concession more properly read as the government saying something along the lines of, well, we don't feel any damages are appropriate here, et cetera, but if they were, the maximum would be this. I mean, isn't it—is it really—I mean, I wonder if this is really relevant to the appeal. Mr. Brooks, I wonder if—you know, you're free to use your time as you want, but it might be better to focus on the points that the judge covered and explain why you think those were— And this—and this is where I'm going, Your Honor. The court came to the conclusion that there were no damages through the misapplication of FAR 52-216-7. The court inappropriately used the December 2002 version of that FAR rather than the July 1991 version of the FAR. This is an important distinction. In the first case, it is the 1991 version that is incorporated into the contract. In the second case, the 1991 version, unlike the 2002 version, includes subsection C. Subsection C reads, for small business concerns, a small business concern may invoice and be paid for recorded costs for items or services purchased directly for the contract, even though the concern has not yet paid for those items or services. This is exactly what DCI did, and it is how it incurred its share of the costs under the contract. There is no dispute as to that point. What the court did below is read the 2002 version of subsection C, which gives no permission to small concerns to record their costs and submit their public vouchers. I thought what the court did was to say that there was no debt incurred here, that the company wasn't liable for anything because there was an uncollectible debt. They weren't on the hook for anything. In fact, the court did say that and bootstrapped from that to conclude that there was no cost incurred. Obviously, the obligation of the contract is not to incur debt but rather cost. It is a cost-sharing contract. But if something is – if I order something and it costs $10,000 and it comes and I use it and I never have to pay for it for whatever circumstance, I haven't incurred costs, have I? Well, in fact, you've never gotten to use it in this case, Your Honor, so the analogy – Well, but it was delivered. It was delivered not to the joint venture, which was the purpose of the contract. It was delivered and modified and then re-delivered for storage. Well, the point is, though, as I understand it, and correct me if I'm wrong with the facts, no money came out of your client's pocket out of Dicaster's pocket for it because of a combination of circumstances. That's actually incorrect, Your Honor. There's at least $180,000 that's been expended by Dicaster's in cash under this contract. What was that for? It went to services. It went to equipment purchases. The allocations that were made, the cash being completely fungible, was not allocated for a piece of equipment or a particular service. It didn't operate that way. It's not part of the 26 percent. The cash? Absolutely. Absolutely. Moreover, in the question of the debt, the debt is a valid debt. Mr. Frederickson, the president of DCI, testified that in the event this goes forward, there is a continuing obligation to pay that debt. There's no question about that. And the court— Is there a mandate by the judge? There are signed purchase orders, Your Honor, and part of the terms, signed purchase orders, signed by DCI, which is an obligation imposed upon them. More importantly, the court seemed to rely upon the statute of limitations. We don't quite understand the court's reliance upon the statute of limitations because, as this court no doubt is aware, the statute of limitations is not an absolute bar but an affirmative defense which needs to be raised. Mr. Frederickson's testimony in open court, at the very least, gives rise to a collateral estoppel that could be used by any of the suppliers or other creditors with respect to those debts. The use of the wrong FAR is, in fact, reversible error. Subsection C makes plain that there were incurred costs and, therefore, there are damages that flowed from the breach. The government attempts to read it— Your Honor, it says that there's not an indication of a trap or a reliance on either version of FAR 52-2167. That is correct, but that— The trial didn't rely on either, whatever the dates were, either the 1991 or the 2002 version, so what? If you look at the opinion at pages 12-13, footnote 10, which is reproduced in the appendix at pages 25-26, you'll see that the judge makes reference to FAR 52-216-7. Here the judge is relying on subsection B. From the analysis of the language of that section, it is clear, as pointed out in the reply brief at pages 7 and 8, that the judge is relying on footnote 10. There are two footnotes on that page, 9 and 10. It is the latter of the two, appendix page 25-26. As pointed out in the reply brief at pages 7 and 8, it is clear— But she's not relying on it in the way that you're suggesting. I mean, it's—she says, according to the contract, costs had to be paid in the ordinary course of business. Which is an obligation under the 2002 version, but not an obligation under the 1991 version. But wait, she said, according to the contract. Would you disagree that the contract required that? Absolutely. Absolutely. That is the whole import of the reliance on the wrong FAR. Subsection 3 of the 1991 version actually relieves a small business concern of the obligation to comply with the timing requirements set forth in subsection B of that same FAR. If it does not, there is no purpose to the language in subsection C of the 1991 version. It is clear also that the government attempted to read into the FAR a requirement that doesn't exist. And that is that the costs incurred have to be cash. Financial contributions is the phrase used by the government. Although there hasn't been much litigation on the concept of equitable distribution in this court, there certainly has been tremendous litigation over that phrase throughout the state and federal court system in the context of divorce. This is tantamount, what the government is saying is tantamount to saying that a non-wage-earning, cash-contributing spouse in a marriage is not entitled to his or her share of an equitable distribution at a divorce. What was supposed to happen here, in no uncertain terms, and this is the government's liability admission, is that at the point the determination was made not to add further funds to this contract. The property was to be divided between the two parties according to all the costs incurred by those parties by their respective share of those costs. That is set forth in the limitation of cost for 52-232-20 subsection H. The costs incurred by DCI, in fact, exceeded the costs it was required to contribute under the contract, roughly $1 million, and extended to $2.9 million. We therefore believe that had there been the mandatory, and the subsection H uses the word shall, which under the FAR definitional section indicates it is mandatory. If there had been a mandatory equitable distribution of the property, DCI would have been entitled- Now, is cost incurred by die-catchers on its own body, or costs incurred after the government gave die-catchers money, and then die-catchers incurred costs in connection with money the government gave? No, this is not cost incurred with respect- this is not cost on top of cost, if that's Your Honor's question. This is independent costs that- And the evidence of that independent cost incurred are signed purchase orders, is that correct? Signed notes for personal loans to the company, signed purchase- Signed notes? I thought the notes were on the slide. No, there are signed notes. There are signed notes- Signed notes? The concern about the lack of signature is on the- Are those signed notes in the record we have? They are, and they're- I don't believe they're reproduced in the appendix. But the question about the unsigned notes, Judge Plevenger- I remember, I want a discussion about unsigned notes. Unsigned notes don't tell me anything, right? Absolutely, but I believe what Your Honor is referring to is the fact that the purchase orders weren't countersigned by the vendors. And, of course, it's not the obligation of the vendor to sign the purchase order, because the claim is not going to be made against the vendor. The party to be charged, DCI, has signed those purchase orders, and there's no question about that, and under the terms and conditions- If it's countersigned by the vendor, then I know it's an obligation, right? No, because the vendor's obligation is simply to comply with the purchase order. There's no question that performance was done and compliance made. Counsel, your time's almost up, so I want to ask you one question before you close the count, which is- The $180,000 that you say was actually expended, I'm just a little puzzled because I didn't find the evidence. Could you direct me to where in the materials you presented to us that is detailed? It is alluded to, not only in the brief- The 26% I got, I didn't know that- $180,000 in particular. You say they actually expended $180,000. During the trial, there was evidence adduced that there were personal notes from the company to individuals for cash brought into the company. There is no question and there is no challenge to the issue of whether that cash was expended for the goods and services purchased by the company. That's the $180,000? That is the $180,000. That is correct. Mr. Brooks, your time hasn't expired, but you have about 50 seconds left of your rebuttal, so I'll give you your full rebuttal. Thank you, Your Honor. You'll have your two minutes. Thank you, Your Honor. Mr. Deere from the government, Ms. Holder? Yes, Your Honor. Did I say that correctly? Yes, Your Honor. Counsel, when you're talking about $180,000, is that right? Is it undisputed that they actually had out-of-pocket pay, $180,000, that has been generalized in the record somewhere? Your Honor, that is not my recollection of what happened at trial, and it isn't referred to in the brief and it isn't in the joint appendix. So I wasn't aware that they were going to rely on that $180,000 debt. I think that if an issue had been made of that at trial, we would point out the same things with respect to the passage of 8 years, no attempt to collect on the debt, and no pass-through claim from whoever that debtor was. Well, tell me in a nutshell why you win. Why we win your case? What did DeBusa not do in order to be able to stand up to the party for an equitable distribution of the assets from the Neil Crager? I'm sorry, if I understand your question. What they're seeking is an equitable distribution. The venture is over, isn't it? There was no joint venture, Your Honor. Well, the contract between the government and die-casters is your conclusion. A die-caster is going to go around there and make some die-casting machines, right? That's the whole idea. Yes, the goal from the government's perspective was that a joint venture would be formed between an American entrepreneur and a manufacturer of weapons of mass destruction in one of the former Soviet Union countries. That was the only goal of the government. Once that happened, the government would transfer title to whatever had been purchased to that joint venture. That didn't happen, but because a decision was made not to add funds to the contract, the contract had expired in January of 1998 by its own terms. At that point, the contracting officer was obligated to sit down and negotiate an equitable distribution under the limitation of cost provision. The contracting officer did write to die-casters and asked them to identify all vendors who had outstanding liens or debts. No response was ever made to that letter, and so he never sat down to actually negotiate an equitable distribution. At trial on the first day, I did concede there was a technical breach because he should have insisted that everybody sit down and look at, are there any outstanding liens or encumbrances on this die-casting equipment, which the government intended to turn over to the Ukrainian government, and it ultimately did go to the two proposed joint venture partners. That did not happen. I then served subpoenas on all vendors to see if, in fact, there were any legitimate debts that the government should pay, and I received nothing that indicated that there was either a legitimate debt or that any of these vendors had any interest in intervening in the case or asking die-casters to do a pass-through claim. Were these vendors in the United States or were they in the Ukraine? Most of the vendors were in the United States. Litmarsh was actually in Transnistria, a country which is not recognized by the United States government, but I did travel to Transnistria to interview the director of that corporation. Where is Transnistria? It was intended to be part of Moldova, but they wanted their independence. And the director was not interested in pursuing. So your conclusion was there was no evidence of any legitimate debts the die-casters owed anybody, so they weren't calling them up, right? So you didn't have an obligation to pay them anything for what they might be on the hook for? Yes, if die-casters had contributed any of their own funds to the performance of the contract or had incurred any legitimate debts, not just from vendors. For example, the employees also were only paid 74% of their salaries. The four employees who terminated their employment all agreed to testify for the government and all were in court to testify on behalf of the government. None of them were pursuing any claims. If die-casters had been successful in raising the investment capital and some investor had given $1 million, which was their share, under the contract to die-casters and then die-casters used that for performance, then they would have made their $1 million contribution. The government made their $3 million contribution. So whatever value that equipment had would be distributed 26% to die-casters and 74% to the government. So at the end of the day, the government said the machinery belongs to us because die-casters never put any money? No, the government's position was the equipment belongs to us because we always had title to that equipment and that title would have gone to the joint venture if there had been a joint venture. But under the Equitable Distribution Clause, the government had an obligation. If they were going to divvy up the property or sell the property and divvy up the proceeds, they had to pay that 26% share if, in fact, die-casters had contributed the 26% share. But there's no dispute that die-casters never had their $1 million, never was able to obtain that $1 million either through investment capital or through loans, didn't spend their own resources and basically funded performance by invoicing the government for 100% of the cost of the equipment or labor or overhead or whatever. The government would then pay 74% and that's basically how they funded the contract. So the question of contract interpretation is a pure legal one. There's three words in the Equitable Distribution Clause, the word property, the word share, and the word cost incurred. I think the trial court correctly interpreted property to mean tangible property, something that could be divided at the end. Share was what percentage did the parties contribute. It turns out that the government basically contributed 100% and die-casters 0%. So you do look at the cost incurred in performance, not the tracing to the equipment itself or whatever that tangible property is. So cost incurred, the court properly interpreted that as cost incurred by DCI in the performance of the contract, either out-of-pocket costs, their own financial... What about the so-called signed purchase orders? The trial court examined at length all of the purchase orders which were presented by the government, by the way not by die-casters, and determined they did not constitute a legally enforceable debt. There were no notes saying that die-casters promised to pay at a certain time the remaining 24%. The government was perfectly willing to recognize the legitimacy of any documented debt. But as the court pointed out, in eight years, no claim had been made by anybody against die-casters, either for labor costs or material costs. With respect to the second... During the course of the die-caster's view of the enterprise, die-casters got money from the federal government, right? $3 million? Yes, Your Honor. And die-casters did something with that money. Yes, Your Honor. And presumably received something in return for where they gave the money to. They bought some products? Yes, Your Honor. But you're saying over and above spending $3 million, there's no evidence that they put themselves in further risk. Exactly, Your Honor. A cost-share contract such as this, it's really an allocation of risk, that the government assumed the risk of spending $3 million and getting nothing, and die-casters assumed the risk of spending $1 million and getting nothing. Nothing. The end was nothing because the joint venture was never formed, because the joint venture partners were unwilling to agree to Mr. Fredrickson's terms. So in that situation, for example, let's say there was nothing at the end. All of the money had been expended for research, development, labor. There would have been nothing to share. The government would have lost its $3 million, and die-casters, if they had spent $1 million, they would have lost it. On the contrary, if you were developing a vaccine, and you developed something that, in fact, became worth more than the maximum estimated value of the contract, then both parties would have benefited. So it's a sharing of risk. With respect to the second issue, I think for all practical purposes, DCI has tacitly admitted that the government did have title to that property, and their argument revolves solely around possession, and that argument is solely based on the word accountable. Well, they were only accountable for the equipment during the term of the contract. After January of 1998, the contract expired. They were accountable. The die-casters argue that in the event we were to disagree with you and decide that this case had to go back for further proceeding, they requested the case not go back, and then tried to get us to heard the case, whom they feel was biased against them. And they've laid that out in their brief. If you say in your brief on page 36 that you think there's no basis for a remand for a new trial, and then you go on to say accordingly because there's no need for a new trial, it shouldn't be the request for a remand that the judge should be denied. You're sort of disconnecting your analysis there. So I take it that the government's view is that there was nothing occurred during the course of the trial that would warrant a review, if you will, of the trial, so you condone the nature of the trial. Your Honor, I'm not sure if I'm in a position to condone or condemn the trial. My point was that if there were improprieties during the trial, it was incumbent upon DCI to file a motion to recuse so that there could have been a factual record made. Moreover, none of the comments that were made during the trial by Judge Braden that are recited in the brief had anything remotely to do with her decision. Her decision was mostly based upon interpretation of the contract. You're saying her decision turned on legal issues? Legal issues entirely. The only factual determination was whether or not there were any legally cognizable debts. I just want to clarify the length of that statement. It was at the very end of your brief that you said, well, no reason to remand for every trial and therefore no reason to send it to a different judge. Now I understand your explanation. Thank you. Thank you, Your Honor. Mr. Brooks, you have your rebuttal. She said you have your full two minutes. Thank you, Your Honor. Ms. Oley conceded before the court that the government had an obligation to sit down. She suggested inappropriately, and I believe accurately, that that obligation somehow requires the attendance or participation of the vendors. The vendors are no longer in this picture. They have delivered the property. They have been paid and agreed to finance the balance of the portion. They have not been paid. Under 52-23220H, the language is quite specific. It doesn't talk about money spent. It talks about costs incurred. Under 15216-7C, costs may be incurred without having been paid if it is a small business concern and it was agreed that DCI was a small business concern. We've been talking only about the breach under Count 1. There is also an allegation of breach under Count 2. And we do not rely on simply the language that Ms. Oda quoted. Was Count 2 the breach of the obligation of good faith and fair dealing? No, that's actually Count 4. The breach under Count 2 is the removal of the property without the consent of DCI. Right. You're in rebuttal now, so you're rebutting the government. That issue wasn't raised in the government's argument, was it? It was raised just now. The government said that the issue was one of title and that we argued possession based on only one point. That's not correct. We argued that we have an obligation under the SAO at 2.2.3B, Appendix 221, that DCI was to provide the Ukrainian joint venture with patenting technology and capital equipment. At A.222, SAO 2.2.3F, DCI will transfer manufacturing technology and install die casting equipment. Until that time, under the contract of A.26H5A, all property equipment and materials acquired by U.S. government funding under this contract shall be acquired solely for the purpose of the joint venture. The government, in taking the property and delivering it to some entity other than the joint venture, breached that provision. Thank you, Mr. Brooks. Thank you, Your Honor. The case is submitted.